SCHELSKE, Respondent, v. SMITH, State Superintendent of Banks, Appellant.

(222 N. W. 941.)

(File No. 6570-6571.   Opinion filed January 5, 1929.)

*Roy E. Willy,* of Sioux Falls, *Orvis & French,* of Yankton, and *F. M. Scoblic,* of Tyndall, for Appellant.

*Miller & Shandorf,* of Mitchell, for Respondent.

BURCH, P. J. This is a consolidated appeal from judgments in two actions. One brought by Joseph Wieger against the defendant and the other by Gottfried Schelske against the defendant. Each action was brought to recover upon a certificate of deposit issued to the plaintiff therein. Both certificates originated in the same transaction, and the issues in the two actions are the same. The Security Bank, defendant, is now insolvent and in the hands of F. R. Smith, superintendent of banks, for liquidation. All facts were stipulated and found by the court as stipulated.

The Security Bank is a corporation. At all times material to the issues involved George E. Pfeifle was the cashier and managing officer of the Security Bank. The two certificates involved in these actions had their inception in a fraudulent scheme of Pfeifle and one Frank R. Beddow, who conspired to issue certificates of deposit upon the regular forms then in use by the Security Bank and to negotiate them for their own use and benefit. Beddow was in no way connected with the bank as an officer, agent, employee, or otherwise. Such certificates were to be made payable to the order of such persons as Beddow would designate; were to be delivered to Beddow or his representative for negotiation; no record was to be made in the books of the bank; and the bank was to receive no consideration therefor. In furtherance of this scheme Pfeifle took from the vaults of the Security Bank the last-numbered pad of blank certificates of deposit containing 100 blank forms. The two certificates in suit were issued from this pad of forms, and no

record was made of the transaction, and the bank received no consideration. The certificate to Wieger was in the sum of $7,100, and the one to Schelske for $2,500. They originated in the following transaction:

Wieger had an equitable interest in a quarter section of land the legal title of which was in Schelske's name, and the land was worth $9,600. Pfeifle filled out from the pad above referred to two certificates, one for $6,000 and the other for $3,600, naming Fred Kostomlatsky as payee. Kostomlatsky was an associate of Beddow, and the certificates were turned over to Beddow, who employed Erhardt Guenthner to sell them. No record was made of these certificates, and the bank received nothing for them and they were false and fraudulent. Guenthner, with one Jacob Haar, approached Schelske and later Wieger, representing that they had a buyer for their land above mentioned, but that he had his money in the Security Bank on certificates of deposit not then due, and proposed to pay for the land with the certificates. Schelske and Wieger agreed to take the certificates if the bank was all right. Guenthner suggested that they go to Tyndall and ask the banker whether the certificates were good and the buyer had money on deposit in the bank. The parties all went to Tyndall; arriving there at noon, finding the bank closed, went to the home of Pfeifle. There Guenthner stated to Pfeifle that Wieger and Schelske wanted to know how the Security Bank stood, and Pfeifle replied that the bank was in good condition; that it had lots of money, and was getting in a large sum that week from farmers marketing their products. Schelske asked Pfeifle if Kostomlatsky had money in the bank, and Pfeifle said that he (Kostomlatsky) had $24,000 in the bank and that was why he wanted to buy land. Wieger asked if the Kostomlatsky certificates of deposit were good, and Pfeifle said they were. All but Pfeifle then drove away. Shortly thereafter Guenthner with a stranger went to Wieger's home, and Guenthner told Wieger that Kostomlatsky would take the land, and asked Wieger to go to the home of Schelske that evening to close the deal. In the evening Guenthner and Haar came to the home of Schelske, where Wieger was, and Guenthner said Pfeifle had telephoned he could not come out, but that Kostomlatsky was in Tyndall, where they should all come and close the deal. Thereupon Guenthner, Haar, Schelske, Wieger, and the wife and son of

Schelske went to Tyndall, getting there about 10 o'clock at night. They went to the home of Pfeifle, and Pfeifle told them Kostomlatsky had left for home thinking they were not coming, but that Kostomlatsky had left the certificates of deposit with him and authorized him to close the deal. The two certificates of deposit payable to Kostomlatsky were produced. Guenthner told Pfeifle that Wieger and Schelske wanted $2,500 by May 28 following, and asked Pfeifle if he could do that. Pfeifle replied that he could, and that he would make out two new certificates of deposit in place of the old ones payable to Kostomlatsky. The two certificates, one for $2,500 to Schelske and the other for $7,100 to Wieger, were then issued in lieu of the Kostomlatsky certificates. A deed to the land was drawn, Schelske and his wife signed and acknowledged it before Pfeifle as notary public and turned it over to Pfeifle. The deed at the time was incomplete in that the name of the grantee and post office address were not inserted therein, but this was unknown to Schelske and wife. Later the name of Jacob Haar and his post office address were inserted in the deed, and the deed was placed on record. Haar and wife then gave a first mortgage on the land for $4,000, a second mortgage of $1,000, and a third mortgage of $3,500, but neither the land nor any of the mortgages or any proceeds therefrom ever went to the Security Bank, and the Security Bank received no consideration for any of the certificates. Neither Wieger nor Schelske knew that Pfeifle and Beddow were engaged in fraudulent transactions or that Kostomlatsky was an associate of Beddow's, nor that Guenthner had been employed by Beddow to dispose of spurious certificates; but they were wholly innocent of any wrongful intent and had no knowledge of any irregular or fraudulent action, except that they knew that the business had not been transacted at the bank and that Pfeifle had made out the certificates at his home. Prior to the commencement of these actions Wieger and Schelske commenced an action against Jacob Haar and others to set aside the deed executed by Schelske and to cancel the mortgages given by Haar, and therein alleged the fraudulent character of the certificates, claiming they were issued in excess of the authority of Pfeifle and were fraudulent and worthless.

The trial court concluded that the defendants are estopped to question the validity of the certificates of deposit in suit and

awarded judgment in favor of plaintiff for the full amount of the certificates, with interest in the respective actions. Defendants appeal from the judgments.

The principal question on this appeal involves the liability of appellant upon the false, fraudulent, and fictitious certificates issued by Pfeifle without. authority in the interest of himself and others in furtherance of a conspiracy and against the interest of appellants. The same question was presented in Citizens' State Bank v. Security Bank of Tyndall, 222 N. W. 932, where the question is discussed and decided adversely to appellant's contention. That case involved another certificate of the same character, issued by the same officer, and in furtherance of the same fraudulent scheme. The opinion in that case is filed simultaneously with this opinion, and on this question no further discussion is necessary.

Appellants contend that in this case there can be no recovery because the transaction was not with the bank and not with its officer at the banking house. Except as the place where the business was transacted affects the proof of the bona fides of respondent's actions we cannot see that it is material. If the certificates had been valid certificates issued to Kostomlatsky for money deposited the fact that they were exchanged for others at the home of the cashier would not invalidate them or the new certificates in lieu thereof. That Pfeifle was able to issue new certificates on blank forms at his home might arouse the suspicion of any one familiar with banking and the details of bank bookkeeping, but even to such the fact that the meeting was prearranged might greatly lessen the force of that suspicious circumstance. To those not familiar with banking it might not even appear to be irregular. Since the bank's liability is in tort for a wrong committed by its principal officer, it should respond in damages for the injury unless respondents are guilty of negligence but for which the loss would not have occurred. Negligence is usually a question of fact. In the trial of this case neither the attorneys nor judge had the correct theory of the case, and for that reason the issue of negligence was not tried nor deemed material at the time. Because of the unusual circumstances and the unsettled condition of the law governing no one is to be blamed. As the law is now settled by the decision in this case and especially in the case of Citizens' State Bank v. Security Bank et al, supra, this

case should be remanded for a new trial, where the issues can be properly framed and the case tried on the correct theory. The certificates were not what they purported to be—nonnegotiable paper of the bank subject to a possible defense which could be ascertained by inquiry or cut off by a false answer. They were forgeries of no value as commercial paper in anybody's hands whether holders in due course or otherwise. The bank is not liable on the certificates, but is liable for the damage done by them. The law of commercial paper is not applicable to forgeries. By means of the forgeries respondents were induced to convey their farm without consideration. If they were thus wronged without negligence on their part by the tortious acts of Pfeifle for which appellant must respond they may recover the damage they actually suffered as the proximate result of Pfeifle's acts.

There is one other question in this case that deserves notice. Respondents commenced an action against Haar to rescind the transaction and set aside the transfer. Appellants contend that thereby they elected their remedy and cannot now recover on the certificates. Of course they cannot rescind and at the same time collect of Haar the consideration. But a suit on the certificates is not a suit to collect the consideration of Haar. The holder of the certificates never had but one remedy against the bank. If respondents have rescinded and returned the certificates to Haar, then they are not holders. But no question on this score is pleaded. Their title and right to the certificates is not questioned. So far as the record is concerned they are the owners. Retaining the certificates may affect their rescission (on this we express no opinion), but it does not affect this action. There is no election of remedies against the bank, as only one remedy is sought.

But the pendency of the action to rescind makes it impossible in the present state of the record to determine the damage, if any, suffered by respondents. If they exchanged for the certificates property worth $9,600 and that property is now lost to them, it is obvious that their damage is $9,600; but if the property is not lost to them, but may be recovered in whole or in part, then their damage is less or nothing at all, depending on the amount of the recovery. Where it is plain the damage suffered is the consideration paid such damage may be diverted from the first victim of the fraud to the one that must suffer by estoppel to deny

the liability. But where the damages have not been ascertained there can be no estoppel until they are ascertained.

The judgment appealed from is reversed. No costs to be taxed in this court.

POLLEY, SHERWOOD, CAMPBELL, and BROWN, JJ., concur.